

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

TH:LAB/AP/KRA
F. #2023R00530

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 16, 2025

By ECF and E-Mail

The Honorable Cheryl L. Pollak
United States Magistrate Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:    United States v. Felix Bonilla Ramos et al.
       Criminal Docket No. 25-196 (WFK)

Dear Judge Pollak:

The government respectfully submits this letter in support of its request that the Court enter permanent orders of detention against defendants Felix Bonilla Ramos, Uriel Lopez, Refugio Martinez, Margarito Ortega, Orlando Ramirez, German Rodriguez, David Vasquez Corona, and Marco Vidal Mendez.[1]  The indictment in this case charges the defendants with crimes related to their membership in, and association with, the violent transnational criminal organization known as the 18th Street Gang ("18th Street").  As set forth in detail below, all of the defendants should be detained, as each poses a serious risk of flight and is a significant danger to the community.

I.    Background

The government proffers the following facts concerning the offense conduct that is relevant to the defendants in this case.  See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (holding that the government may proceed by proffer in a detention hearing); United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995) (same); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986) (same).

The proof that the government expects to use at trial to prove the proffered facts

---

[1]    Vidal Mendez is currently in federal custody pursuant to a previously entered permanent order of detention in United States v. Vidal Mendez, 24-CR-402 (OEM), in which he faces separate charges.  The government expects that Vidal Mendez will be brought before the Court for arraignment tomorrow.

includes: (1) testimony from eyewitnesses; (2) video surveillance footage; (3) text messages, photographs, and other materials recovered, pursuant to judicially authorized warrants, from cellular telephones and iCloud accounts belonging to the defendants and their co-conspirators; (4) phone and toll records; (5) financial records; (6) crime scene evidence; (7) medical records; and (8) post-arrest statements by the defendants.

A.  <u>Defendants' Membership and Association with 18th Street</u>

18th Street is a violent street gang with members and associates residing throughout the United States and Central America. The defendants in the instant indictment are Queens-based members and associates of the gang's "54 Tiny Locos" clique, which controls a busy commercial area along Roosevelt Avenue in Jackson Heights, Queens. The gang has controlled this area for over a decade through the use of violence, including brutal assaults against individuals (often innocent bystanders) perceived to be rival gang members, and threats of violence, including the extortion of other illegal businesses in the area, such as brothels. The defendants make money through a range of illegal activities, including trafficking in fraudulent identification documents, counterfeit currency, and narcotics.

Each charged defendant has been involved in serious acts of violence, has participated in the gang's money-making activities, and has played an important role in the gang's operations. Defendant Bonilla Ramos is the "shot caller," or local leader, of the 54 Tiny Locos; defendants Lopez, Martinez, Ortega, Ramirez, Vasquez Corona, and Vidal Mendez are "soldiers," or members, in the 54 Tiny Locos; and defendant Rodriguez is an associate of the 54 Tiny Locos. The chart appended to this letter as Exhibit A sets forth the hierarchy of the defendants and their individual ranks within the gang.

B.  <u>The Defendants' Violent Conduct</u>

18th Street has engaged in significant violence towards rivals and civilians, reflecting the gang's utter disregard for the safety and well-being of the Jackson Heights community. The three incidents currently charged in the Indictment, detailed more fully below, illustrate 18th Street's infliction of substantial harm on its victims.

i.  <u>December 31, 2021 Assault in aid of Racketeering</u>

On December 31, 2021, a member of 18th Street, Erick Estrada, approached John Doe #1 and his friend outside of a bar in Queens, New York. Estrada asked John Doe #1 and his friend if they were in a gang, a common practice that 18th Street members engage in to protect 18th Street territory from rival gang members, which is sometimes referred to as "pressing." After a brief exchange, Estrada punched John Doe #1, and John Doe #1's friend pushed Estrada, knocking him over. Several other members of 18th Street—including Bonilla Ramos, Lopez, and Ramirez—then arrived and assaulted John Doe #1 and his friend. The assailants violently beat both John Doe #1 and his friend, including twice smashing John Doe #1's head with a glass tequila bottle, leaving him with severe lacerations to his face and nerve damage. The assault was captured on video.

### ii.    January 15, 2022 Assault in aid of Racketeering

On January 15, 2022, members of 18th Street attacked John Doe #2 and John Doe #3 in Queens, New York.  The fight began inside the bar, when an individual approached and punched John Doe #2.  In the ensuing assault, an 18th Street member ("Co-Conspirator 1") stabbed John Doe #2, while Lopez and Ramirez held him in place.  Bonilla Ramos later exited the bar and kicked in the direction of John Doe #2 as he lay on the ground.  John Doe #2 sustained serious injuries, including injuries to his lung.  The assault was captured on video, and its brutality is evident by the pool of blood it left behind:

 

18th Street members—including Co-Conspirator 1, Lopez, and Ramirez—then attacked another victim, John Doe #3, outside of the same location, some of whom used large wooden planks, causing lacerations to John Doe #3's head that required sutures.

### iii.    June 20, 2024 Assault in aid of Racketeering

On June 20, 2024, numerous members of 18th Street attacked John Doe #4 in a parking lot in Queens, New York.  After defendant Ortega identified John Doe #4 as a potential rival gang member, a group of assailants chased John Doe #4 down the street and into a parking lot.  When the group arrived, the assailants – including Rodriguez, Vidal Mendez, and Vasquez Corona – beat John Doe #4 with, among other things, a bike lock and a metal chair.  John Doe #4 was treated for lacerations to his head, which required sutures.  The assault was captured on video.

### iv.    Additional Violent Crimes

The three charged assaults are only a part of the pattern of violence that 18th Street has inflicted on the community of Jackson Heights.  A review of law enforcement records, including police reports and related video footage, indicates that the defendants have been involved in numerous additional instances of violence in recent years:

- On May 30, 2017, several individuals—including Bonilla Ramos and another 18th Street member—assaulted multiple victims inside of a restaurant.  The group left and returned around one minute later, and one of the assailants then fired a firearm in the direction of the restaurant, with more than a dozen people inside.

- On March 2, 2021, several individuals—including Martinez—assaulted a victim on the street, punching and kicking the victim in the head.  The victim suffered a broken jaw and required surgery.

- On June 5, 2021, several individuals—including Lopez—approached and started to punch a victim.  The assailants then hit the victim with a baseball bat.[2]

- On June 19, 2021, several individuals—including Martinez and another 18th Street member, Jimmy Vasquez—approached and assaulted a victim.  In the course of the assault, Vasquez shot the victim in the leg.[3]

- On August 27, 2021, several individuals—including Martinez—assaulted a victim after he declined to purchase marijuana and to leave the area.[4]

- On September 10, 2022, Bonilla Ramos punched a victim inside of an after-hours location.  After the victim responded, several individuals—including Bonilla Ramos and Lopez—assaulted the victim and his friend, holding the victims down as they beat them with fists and objects.[5]

- On February 22, 2024, two victims approached and assaulted an individual, and in response, several individuals—including Martinez and Ramirez—approached, impeded, and assaulted the victims.  In the course of these events, one of the victims suffered a laceration to his head.[6]

- On July 23, 2024, several individuals—including Ortega—approached and assaulted an individual that they appeared to believe was a rival gang member. Two of the assailants struck the victim with objects, including a metal pipe.

- On August 8, 2024, a group of individuals—including Lopez and Vidal—

---

[2]    On April 27, 2022, Lopez pled guilty to second-degree attempted assault, was also sentenced to five years' probation, and remains on probation today.  On May 24, 2023, Lopez was sentenced to six months' imprisonment in connection with a violation of probation.

[3]    Vasquez was convicted for his role in this assault in this District and sentenced to 10 years' imprisonment.  See United States v. Vasquez, 21-CR-381 (RPK).

[4]    On March 30, 2022, Martinez was convicted of disorderly conduct, a violation, and was sentenced to conditional discharge.

[5]    On May 10, 2023, Bonilla Ramos plead guilty to third degree assault, a misdemeanor, and was sentenced to conditional discharge.  On October 25, 2023, Lopez plead guilty to third degree assault, a misdemeanor, and was sentenced to time served.

[6]    On April 29, 2024, Martinez and Ramirez plead guilty to third-degree assault, a misdemeanor, and were sentenced to a conditional discharge.

approached, assaulted, and robbed a victim.[7]

- On January 26, 2025, several individuals—including Martinez—chased and assaulted two victims. The victims were stabbed, and one of them required emergency surgery.[8]

- On March 13, 2025, two individuals—including Ortega—assaulted a victim. The victim was punched in the face with a closed fist.

- On March 17, 2025, several individuals—including Bonilla Ramos and Vasquez Corona—assaulted a victim. One of the assailants struck the victim in the face with a beer bottle, causing a laceration to his forehead.[9]

- On May 22, 2025, several individuals—including 18th Street member Luis Mosso—approached a victim. One of the assailants slashed at the victim with a knife, and Mosso brandished a firearm.[10]

     v.   Firearms Possession

18th Street members, including the defendants, also routinely possess, transfer, and use firearms – many of which are then used in significant acts of violence. During the charged racketeering conspiracy, much of which occurred under Bonilla Ramos's leadership, 18th Street gang members committed numerous shootings, including at least one murder. See, e.g., United States v. Herberth Rodriguez, 20-CR-548 (WFK) (S-2) (charging 18th Street members with murder and attempted murder); United States v. Jimmy Vasquez, 21-CR-381 (RPK) (charging Vasquez, an 18th Street member, with assault involving a firearm). The gang's ready access to firearms and its willingness to use them only further illustrates the dangers it and its members pose to the community. Indeed, just three weeks ago, officers seized the loaded firearm pictured below (left) from Mosso only moments after he and other 18th Street members perpetrated the violent assault described above. And during execution of a search warrant on the

---

[7]    This matter is still pending with the Queens County District Attorney's Office.

[8]    On May 16, 2025, Martinez plead guilty to third-degree attempted assault, a misdemeanor, was sentenced to probation, and remains on probation today.

[9]    Bonilla Ramos and Vasquez Corona have been charged by complaint by the Queens County District Attorney's Office and this matter remains open. Despite being arrested, it appears from his criminal history that Vasquez Corona returned to the scene of the crime to confront the victim again the next day.

[10]    Mosso is currently charged with being a felon in possession of the weapon used in this assault in United States v. Mosso, 25-MJ-191.

home of Martinez and Ramirez this morning, law enforcement found ammunition (right). [11]

 

C. The Defendants' Revenue-Generating Crimes

18th Street's longstanding control of this territory has allowed it to engage in a wide range of crimes to enrich the gang and its members and associates.

i. Fraudulent Documents Trafficking

18th Street dominates the fraudulent documents trade in Jackson Heights. The gang's production and sale of fraudulent documents—including passports, permanent resident cards, social security cards, driver's licenses, and Occupational Safety and Health Administration cards—has continued unabated for years. Samples of the items produced by the defendants and obtained by law enforcement are included here:

 

The centrality of this scheme to the gang's operations is reflected by the following image, recovered from Vidal Mendez's device, depicting (from left to right) Vasquez Corona, Bonilla Ramos, Vidal Mendez, Ortega and Rodriguez superimposed on a social security card:

---

[11]    Law enforcement also found brass knuckles and a large black knife during a search of the home of Lopez.



ii.  <u>Counterfeit Currency Trafficking</u>

18th Street is involved in dealing counterfeit United States currency.  Members have engaged in numerous sales involving large volumes of counterfeit currency that appears to be legitimate, as evidenced by the following currency, which was obtained by law enforcement:

          

**Counterfeit $100 Bill**                    **Genuine $100 Bill**[12]

iii.  <u>Drug Trafficking</u>

18th Street is involved in dealing controlled substances, including cocaine and cocaine base.  Members and associates sell both dealer-level and user-level quantities, reflecting their integration into the local drug trade.  Indeed, law enforcement has in recent years conducted controlled purchases of narcotics from several of the charged defendants, and during a search of the home belonging to Ortega this morning, law enforcement found what appear to be additional controlled substances, specifically, cocaine and cocaine base.  As with the fraudulent documents, the gang's illicit sales often take place throughout public spaces and among legitimate and commercial businesses along Roosevelt Avenue.

---

[12]    *United States One-Hundred-Dollar Bill*, Wikipedia (accessed June 6, 2025), https://en.wikipedia.org/wiki/United_States_one-hundred-dollar_bill.

iv.  Extortion

18th Street's dominance of its territory—and its willingness to use violence
maintain that dominance—has also allowed it to extort other illegal actors in the area through an
extortionate practice that gang members call collecting "rent."  The gang's targets include others
trafficking fraudulent documents or narcotics and individuals running brothels.

II.    The Bail Reform Act

In deciding whether to release or detain a defendant, a court "must undertake a
two-step inquiry."  United States v. Friedman, 837 F.2d 48, 49 (2d Cir. 1988).  "It must first
determine by a preponderance of the evidence that the defendant either has been charged with
one of the crimes enumerated in Section 3142(f)(1) or that the defendant presents a risk of flight
or obstruction of justice."  Id.  "Once this determination has been made, the court turns to
whether any condition or combinations of conditions of release will protect the safety of the
community and reasonably assure the defendant's appearance at trial."  Id.

If the court finds that "no condition or combination of conditions will reasonably
assure the appearance of the person as required and the safety of any other person and the
community," the court "shall order" a defendant detained.  18 U.S.C. § 3142(e)(1).  The
government bears the burden of persuading the court by a preponderance of the evidence that the
defendant is a flight risk or by clear and convincing evidence that the defendant is a danger to the
community.  United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001).

Whether detention is sought on the basis of flight or dangerousness, the Bail
Reform Act lists four factors to be considered in the detention analysis:

(1) the nature and circumstances of the crimes charged, "including whether the
offense is a crime of violence . . . or involves a . . . firearm";

(2) the weight of the evidence against the defendant;

(3) the history and characteristics of the defendant, including the defendant's
"past conduct" and "criminal history"; and

(4) the nature and seriousness of the danger posed by the defendant's release.

See 18 U.S.C. § 3142(g).  In evaluating dangerousness, courts consider not only the effect of a
defendant's release on the safety of identifiable individuals, such as victims and witnesses, but
also "the danger that the defendant might engage in criminal activity to the detriment of the
community."  United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (cleaned up).

III.    All Defendants Pose a Danger to the Community and Risk of Flight

The government respectfully submits that each charged defendant poses a danger
to the community and risk of flight, and therefore should be detained.

First, the nature and circumstances of the offenses are very serious.  The

defendants are charged with being members and associates of a gang that commits murder and serious acts of violence, and several defendants are charged with assaults in which the victims were brutally beaten and assaulted. Courts in this Circuit have repeatedly recognized that pretrial detention is warranted where, as here, defendants are members of criminal organizations whose activities routinely include violence and threats of violence.

The danger is particularly acute in this case given that the gang routinely targets other perceived to be enemies—such as the victims of the "pressing" detailed above—as well as members perceived to be cooperating with law enforcement. See 18 U.S.C. § 3142(f)(2); United States v. Madoff, 586 F. Supp. 2d 240, 247 (S.D.N.Y. 2009) (preponderance of the evidence standard applies to determination of both risk of flight and risk of obstruction of justice). For example, a recent prosecution in this District involved a murder of a member of another 18th Street clique, who lived in Queens, by other members of his clique who believed the victim was cooperating with law enforcement. See United States v. Cruz-Mateo et al., 18-CR-139 (LDH).

Second, as described above, the weight of the evidence against each defendant is strong. That evidence includes, among other things, eyewitness testimony, video footage, text messages and other media from the defendants' and their co-conspirators' devices, phone and toll records, financial records, crime scene evidence, medical records, and post-arrest statements by the defendants. See United States v. Millan, 4 F.3d 1038, 1046 (2d Cir. 1993) (holding that, where the evidence of guilt is strong, it provides "a considerable additional incentive to flee"). This government expects that this evidence will establish each defendants' membership in the enterprise—such as images of the defendants throwing up gang signs—and their commission of illegal acts—such as video footage showing them visibly committing assaults, or message threads in which they explicitly discuss illegal gang activities with other members.

Third, the defendants' history and characteristics weigh heavily in favor of detention. As noted above, the defendants are all members or associates of a violent transnational gang with a strong presence both in the United States and abroad, including Mexico. See, e.g., Williams, 2020 WL 4719982, at *3 (holding that defendant's gang membership weighed against pretrial release).

Moreover, all of the defendants except for Rodriguez lack legal status in the United States. As non-citizens with no legal status in this county, these defendants have an additional incentive to flee. See, e.g., United States v. Santos, No. 19-CR-819 (VM), 2020 WL 3446866, at *3 (S.D.N.Y. June 24, 2020) (holding that non-citizen with outstanding warrant for removal posed a flight risk). This is a particularly significant concern where, as here, the defendants have both the means to quickly create fraudulent passports and identification documents and ties to other countries, in particular, Mexico.

Fourth, the risk of further violence and flight by the defendants is severe. Courts have consistently held that where a defendant is associated with a violent criminal organization, no conditions — even stringent conditions of home confinement — are sufficient to protect the community. See United States v. Destine, No. 20-CR-293 (WFK), 2022 WL 2181453, at *4 (E.D.N.Y. June 16, 2022) ("Courts have consistently held no conditions are sufficient to protect the community in the face of membership in a violent criminal organization."); United States v. Irizzary, No. 17-CR-283 (LAP), 2020 WL 1705424, at *3 (S.D.N.Y. Apr. 8, 2020) ("Even under

9

normal conditions, electronic monitoring does not suffice to restrain violent criminals who, like [the defendant], are members of organized gangs.").[13] This is especially the case here, given the extensive history of the defendants' involvement in violence in our communities.

Moreover, the charged offenses carry significant penalties that give the defendants a strong incentive to flee. Each defendant faces up to twenty years in prison. See United States v. Khusanov, 731 F. App'x 19, 21 (2d Cir. 2018) (summary order) ("[A] district court does not clearly err in concluding that a defendant facing a potentially lengthy prison sentence possesses a strong motive to flee").

In sum, the defendants before this Court today cannot be released without risking the safety of the community and the likelihood that they will not return to court as required. All defendants in this case should, therefore, be detained.

IV.   Conclusion

For the reasons set forth above, the government respectfully submits that no condition or combination of conditions will properly assure the safety of the community or the defendants' return to court if they were released on bail, and therefore requests permanent orders of detention as to all defendants scheduled to appear before this Court later today.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:   /s/ Kamil R. Ammari
Lauren A. Bowman
Andrés Palacio
Kamil R. Ammari
Assistant U.S. Attorneys
(718) 254-6075 (Ammari)

cc:   Clerk of the Court (WFK) (by ECF)
Counsel of Record (by ECF and E-Mail)
United States Pretrial Services (by E-Mail)

---

[13]   See also United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology"); accord United States v. Brennerman, 705 F. App'x 13, 16 (2d Cir. 2017); United States v. Dono, 275 F. App'x 35, 37 (2d Cir. 2008); United States v. Kelly, No. 19-CR-286 (AMD), 2020 WL 2528922, at *3 (E.D.N.Y. May 15, 2020) ("Nor are the defendant's proposed measures — that he be kept on home confinement and monitored by pretrial services — sufficient to eliminate the danger to the community.").

**EXHIBIT A**

